UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

---

In re

PAUL F. DINKINS,

    Debtor.

Case No. 04-28251

Chapter 7

---

ROMES DESIGN, INC.,

    Plaintiff,

v.

PAUL F. DINKINS,

    Defendant.

Adversary No. 04-2229

---

CENTRAL CONSULTING ENGINEERS, LTD,,

    Plaintiff,

v.

PAUL F. DINKINS,

    Defendant.

Adversary No. 04-2230

---

MEMORANDUM DECISION ON
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

---

The plaintiffs, Romes Design and Central Consulting, brought these actions objecting to the dischargeability of certain obligations incurred by The Stubenrauch Architects, Inc., of which the defendant, Paul Dinkins, was president, director, and shareholder. The defendant filed motions for summary judgment in both adversaries seeking dismissal on the merits. The parties fully briefed the issue of whether nondischargeable theft by contractor liability is applicable to the obligations of The Stubenrauch Architects, Inc. and, in his representative capacity, Mr.

Dinkins. The court is satisfied that under the uncontested facts of this case, it does not, and the debtor is entitled to summary judgment as a matter of law.

This court has jurisdiction under 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This decision constitutes the court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

## BACKGROUND

The chapter 7 debtor, Paul Dinkins, was president, director, and shareholder of The Stubenrauch Architects, Inc. (TSA), an architectural firm in Sheboygan, Wisconsin. Central Consulting and Romes Design are both engineering firms, specializing in heating and plumbing and electrical design, respectively. Property owners or general contractors hired TSA to provide architectural and engineering plans for buildings to be constructed on the owner's property. TSA, in turn, contracted with the plaintiffs on various projects. The plaintiffs provided consulting services to TSA, primarily design specifications for the projects at issue, and did not engage in the actual purchase, fabrication, or installation of any equipment. According to Mr. Dinkins, TSA did not engage in any construction or act as a general contractor for any of the projects.

According to the plaintiffs, TSA's work was typically governed by Standard AIA Document B141, entitled "Standard Form of Agreement Between Owner and Architect." A few of the jobs were subject to variations, and there were optional duties that could be selected under the B141. The contractual obligations under the standard agreement included:

> 2.6.1 The architect's responsibility to provide basic services for the construction phase under this agreement commences with the award of the contract for construction and terminates at the earlier of the issuance to the owner of the final certificate for payment or sixty (60) days after the date of substantial completion of the work....

2.6.4   The architect shall be a representative of and shall advise and consult with the owner (1) during construction until final payment to the contractor is due....
2.6.5   The architect shall visit the site at intervals appropriate to the stage of construction ... become generally familiar with the progress and quality of the work completed and to determine in general if the work is being performed in a manner indicating that the work, when completed, will be in accordance with the contract documents ... the architect shall keep the owner informed of the progress and quality of the work, and shall endeavor to guard the owner against defects and deficiencies in the work....
2.6.11   The architect shall have authority to reject work  ... the architect will have authority to require additional inspection or testing of the work....
2.6.13   The architect shall prepare change orders and construction change directive ... and may authorize minor changes....
2.6.14   The architect shall conduct inspection, determine the date or dates of substantial completion and the date of final completion....
2.6.15   The architect shall interpret and decide matters concerning performance of the owner and contract under the requirements of the contract documents....
3.2.3   Through the observations by such project representative, the architect shall endeavor to provide further protection for the owner against defects and deficiencies in the work....
3.4.4   Providing special surveys, environmental studies and submissions required for approval of governmental authorities or others having jurisdiction over the project....
3.4.8   Providing coordination of construction performed by separate contractors or by the owner's own forces and coordination of services required in connection with construction performed and equipment supplied by the owner....
3.4.17   Providing assistance in utilization of equipment or system such as testing, adjusting and balancing, preparation of operation and maintenance manuals, training personnel for operations and maintenance and consultation during operation....

Standard AIA Document B141.

Also according to the plaintiffs, some projects used alternative contracts for services provided by TSA.  One such contract included the following obligations:

Job progress meeting and site inspection oversight and coordination bi-weekly or as specific construction activity warrants.  Assistance with project close-out procedures and compliance with requirements for owner occupancy and orientation of building systems.
Development of punch list and follow-up procedures for completion of work.
Assistance with warranty-related item.
Coordination of one-year building performance review and assistance in resolving any identified issue.
Job progress meeting and site inspection oversight and coordination during building structural system construction.
Coordination of site survey procedures and requirements.

3

Coordination of geotechnical and subsurface exploration proceedings and requirements. Ironwood Plastics Remodel Contract. Mr. Dinkins admits that on certain projects TSA provided supervisory and other services, such as certifying the percentage of construction completion to authorize the release of construction funds. The content of the contracts and the description of the debtor's firm's duties appears not to be disputed.

Whether or not TSA was paid in full on all of the projects is disputed. Since the issue of payments to TSA is not a fact material to the narrow issue here, the court will assume for purposes of summary judgment that TSA was paid on all of the projects. *See Smith v. Dunn*, 368 F.3d 705, 708 (7th Cir. 2004) (at summary judgment stage, facts should be reviewed in the light most favorable to the nonmoving party). Naturally, there would be no funds held in trust for any projects in which TSA was not paid by the general contractor or owner. Additionally, it is not clear from the record whether or not actual construction occurred on all of the projects, but it appears that at least two were not started.

TSA encountered financial difficulties in the early 1990s after a group of shareholders established a defined benefit pension plan, retired within a few years of each other, and left an unfunded liability. Consequently, TSA incurred a substantial tax liability which inhibited its profitability for the next decade. After some substantial projects failed to get off the ground, TSA filed for bankruptcy on March 16, 2004. The debtor, Mr. Dinkins, filed for chapter 7 relief on May 28, 2004, after demands were made for his guaranty of both the building lease and bank financing.

ARGUMENTS

4

Case 04-02230-mdm    Doc 40    Filed 06/30/05    Page 4 of 12

The defendant contends because TSA simply provided design services, funds received by it are not within the scope of a statutory trust fund. Theft by contractor liability only extends to those parties who either perform physical construction work or act as a general contractor on a project. TSA was thus not obligated to treat monies it received as a statutory trust fund, and the debtor's obligations as an officer of TSA are dischargeable.

The plaintiffs argue that material facts in dispute relating to the nature and scope of TSA's work on the various projects and the actual contractual relationship between TSA and the various project owners preclude summary judgment in the defendant's favor. The theft by contractor statute should not be read as narrowly as the defendant proffers, but rather construed to encompass the services performed by TSA, thus making the plaintiffs beneficiaries of trust funds paid to TSA.

DISCUSSION

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The "theft by contractor" provisions of Wis. Stats. §§ 779.02(5) and 779.16 create a trust fund for sums paid by an owner to a general contractor for the benefit of subcontractors and material suppliers. *Kraemer Bros. Inc. v. Pulaski State Bank*, 138 Wis.2d 395, 399-400, 406 N.W.2d 379, 381 (Wis.1987). Wisconsin's theft by contractor statute establishes the type of express statutory trust contemplated by § 523(a)(4) of the Bankruptcy Code. *See Matter of*

5

*Thomas*, 729 F.2d 502 (7th Cir. 1984) (applying Wis. Stat. § 779.16, theft by contractor statute, public improvements).

>Wis. Stat. § 779.02(5) provides in full:
>
>Theft by contractors. The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20. If the prime contractor or subcontractor is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation. Any of such misappropriated moneys which have been received as salary, dividend, loan repayment, capital distribution or otherwise by any shareholder of the corporation not responsible for the misappropriation shall be a civil liability of the shareholder and may be recovered and restored to the trust fund specified in this subsection by action brought by any interested party for that purpose. Except as provided in this subsection, this section does not create a civil cause of action against any other person. Until all claims are paid in full, have matured by notice and filing or have expired, such proceeds and moneys shall not be subject to garnishment, execution, levy or attachment.

Section 779.02(5), Wis. Stats.

No wrongful intent is required for a finding of nondischargeability. It is only necessary for the plaintiff to prove that funds received from the owner should have been paid to a beneficiary of the statutory trust, and the debtor failed to do so. If an individual debtor is an officer, director, or agent responsible for misappropriation by an entity, the debt will be excepted from the discharge of the individual.

A prime contractor is defined by statute as:

6

1. A person, other than a laborer, but including an architect, professional engineer, or surveyor employed by the owner, who enters into a contract with an owner of land who is not personally the prime contractor as defined in subd. 2. to improve the land, or who takes over from a prime contractor the uncompleted contract; or

2. An owner of land who acts personally as general contractor in improving such land.

Section 779.01(2)(d), Wis. Stats. Clearly the theft by contractor statute *could* apply to an architecture firm, such as TSA, depending on the nature of the services rendered. Mr. Dinkins, however, claims the architects in this case engaged in no "improvement" activity, which is a necessary precursor to having the theft by contractor statute apply. That statute provides:

> "Improve" or "improvement" includes any building, structure, erection, fixture, demolition, alteration, excavation, filling, grading, tiling, planting, clearing or landscaping which is built, erected, made or done on or to land for its permanent benefit. This enumeration is intended as an extension rather than a limitation of the normal meaning and scope of "improve" and "improvement."

Section 779.01(2)(a). Mr. Dinkins contends that passive design activity, acts done without touching the land, is wholly dissimilar in character from the activity deemed "improvement." Everything in the list requires actually making a change on the land. By implication, something that does not change the land in any way should be excluded from the list of activities that result in improvements. Thus, he argues that architects only become liable under the theft by contractor statute when they cross over into the roles typically held by general contractors.

Mr. Dinkins is correct that the published case law overwhelmingly involved allegations of theft committed by prime contractors. The court was unable to find any published case involving an architect sued under the statutes. There was one unpublished case, *Louie's Refrigeration, Inc. v. Hunter*, 1989 WL 112039 (Wis. App. 1989), which found the architect not liable under the statute because he did not "exhibit the attributes of a prime contractor." Thus, Wisconsin law interprets the definition of "prime contractor" to apply to one who acts in a

7

Case 04-02230-mdm    Doc 40    Filed 06/30/05    Page 7 of 12

particular function, which may include architects, but only if the architect is filling the function of a prime contractor, as that role has developed by case law, custom, and contract.

This court has scoured the contracts submitted and plaintiffs' affidavits for any allegation that TSA engaged in any job as a prime contractor, which would then require a factual determination at trial as to whether such was the case. All submissions show that TSA had considerable involvement in the projects in some instances, but in all cases its involvement was of a design or supervisory nature. The architectural firm designed the projects and represented the owners in overseeing the quality of work done, such as making or arranging for inspections, authorizing progress and final payments, compiling punch lists, and other evaluative functions. The plaintiffs characterize this as having a hand in creating the "improvements" on the land, which it does. However, evaluating the work of those doing the improvements, described in Wis. Stat. § 779.01(2)(a) as "building, structure, erection, fixture, demolition, alteration, excavation, filling, grading, tiling, planting, clearing, or landscaping," is qualitatively different from doing the work itself. Creating plans and evaluating the project - what TSA did- is different from hiring and directing the people who actually make changes on or to the land. Only the latter qualifies as improvements, and this is what a prime contractor does. Conspicuously absent from the contracts quoted and submitted, and the allegations made, is any allegation that TSA took on the duties of a prime contractor at any time. In fact, most jobs (perhaps all) had a separate prime contractor.

*Louie's Refrigeration, Inc. v. Hunter*, 1989 WL 112039 (Wis. App. 1989), points out that the architect in that case did not accept payment for other contractors. The plaintiffs argue that by being paid for its own and the plaintiffs' services, TSA accepted funds on their behalf. After

8

all, they were hired by TSA to execute engineering specifications and designs to go along with the architectural plans and project oversight. This is quite true and creates a liability on the part of TSA, but it does not necessarily result in a nondischargeable obligation on the part of Mr. Dinkins. To recover under the theft by contractor statute, and to have the debt held nondischargeable under 11 U.S.C. § 523(a)(4), the plaintiffs must show that TSA acted as a prime contractor, and Mr. Dinkins is responsible for its defalcation. This court holds that as that term is applied under Wisconsin law, TSA was not a prime contractor.

Even if TSA were a prime contractor, the plaintiffs also have to qualify as beneficiaries under Wis. Stat. § 779.02(5); that is, the plaintiffs must have a claim for "labor and materials used for the improvements." The plaintiffs created the plans used by those who did provide the labor and materials, but the plans existed independent of the building, erection, etc., that resulted in a change on the land in question. Qualitatively, engineering plans and specifications are different from the actual building of the improvement, because planning makes no physical, permanent change on the land. Like TSA's function, the plaintiffs' function does not result in improvements. Therefore, it does not qualify for the protections of the theft by contractor statute.

The plaintiffs point out that designs, such as were provided by both TSA and the plaintiffs, are protected by the lien statute, Wis. Stat. § 779.01(3), and they argue that by analogy, designs should also be protected by the theft by contractor statute. At the very least, the designs should be included in the definition of "improvements" because of their inclusion in the list of services entitled to lien status. That section provides that "[e]very person who performs any work or procures its performance or furnishes any labor or materials or *plans or*

9

*specifications* for the improvements of land" (emphasis added) shall have a lien on the real estate improved, provided they give the owner the statutorily mandated notice. This court does not disagree, were this court establishing public policy. However, Wisconsin law does not equate the lien statute with the theft by contractor statute, by analogy or otherwise. Indeed, *Wisconsin Dairies Coop. v. Citizens Bank & Trust*, 160 Wis.2d 758, 467 N.W.2d 124 (1991), makes clear that the lien statute and the theft by contractor statute are separate and must be interpreted separately.

> A careful reading of sec. 779.02(5), Stats., discloses no relationship between lien claims, which arise under other sections of ch. 779, and the trust fund protection accorded to subcontractors. Section 779.02(5) makes no reference to lien rights or to any statute concerning the perfection of lien rights. Furthermore, the statutory trust created by the section is a remedy against contractors, whereas the statutory lien provisions provide subcontractors with a remedy against owners.

*Id.* at 770, 467 N.W.2d at 129. When different words are used in a statute, and a plaintiff performs the type of services that are protected by one statute and not the other, it is not up to this court to hold that the distinction is poor policy. Here, state law does not make the maker of designs and plans a beneficiary of the trust fund statute, no matter how valuable and indispensable their services are to the project, as it does those who provide labor and materials to improve the land. The plaintiffs might be beneficiaries of the lien statute, but that will not help them here.

The debtor has asked that this court award sanctions for plaintiffs' violation of Rule 11, incorporated in the bankruptcy rules as Fed. R. Bankr. P. 9011, because filing this action was not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed. R. Bankr. P. 9011(b)(2). This action is not frivolous. The law on this subject is not well developed or recent. Architects are

mentioned in the definition of prime contractors, although the allegations in this case are insufficient to take this matter to a trial on the merits as to whether the debtor's firm acted as a prime contractor. The engineering specifications were undoubtedly "used" by those who made "improvements;" it just happens that theft by contractor law developed to require that the items used and the improvements be of the bricks-and-mortar physical type, not the creative planning type. Nevertheless, the plaintiffs' interpretation makes grammatical and logical sense. It is not frivolous to ask that the inconsistency in those protected by the lien statute and the theft by contractor statute be harmonized when the distinction makes no logical sense (except perhaps as could be explained by the difference in the vigor and attention of lobbies for the constituencies addressed). No sanctions will be imposed.

## CONCLUSION

This court holds that there are no genuine issues of material fact, and the defendant is entitled to summary judgment as a matter of law. Neither the debtor, nor the entity he controlled, acted as prime contractor for any job for which the plaintiffs were not paid. Furthermore, Wisconsin law does not provide that plaintiffs are beneficiaries of the theft by contractor statute as their services did not result in "labor and materials used for improvements" under Wis. Stat. § 779.02(5). *See also* Wis. Stat. § 779.01(2)(a). Any debt defendant owed the plaintiffs is discharged.

The defendant is entitled to customary statutory costs, but Rule 11 sanctions are denied. A separate order will be entered.

By the Court:

11

Dated: June 30, 2005

　　　　　　　　　　　　　　　　/s/ Margaret Dee McGarity
　　　　　　　　　　　　　　　　Margaret Dee McGarity,
　　　　　　　　　　　　　　　　Chief Judge, U.S. Bankruptcy Court

12